SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMED AHMED SALAM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-02386 (RBW) |
| | ) | |
| GEORGE WALKER BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## EXHIBIT LIST

Declaration of D3 ██████████ "Background Declaration -- Intelligence 101" (Sept. 19, 2008)

Declaration of Robert H. Holmes, "Use of Intelligence Products in the Targeting and Operation Cycles in Operation Enduring Freedom" (Aug. 22, 2008)

Declaration of D3 ████ "Background Declaration -- Guest Houses" (Sept. 19, 2008)

Declaration of D3 ████ "Background Declaration -- Terrorist Training Camps" (Sept. 19, 2008)

Declaration of D3 ████ "Tora Bora" (Sept. 19, 2008)

Declaration of D3 ████ "Background Declaration –The Libyan Islamic Fighting Group (LIFG)" (Sept. 19, 2008)

Declaration of D3 ████ "Background Declaration – Terrorist Organization," (Sept. 29, 2008)

Declaration of D3 ████ "Background Declaration – Lashkar-e-Tayyiba," (Sept. 29, 2008)

Declaration of D3 ██████████ "Background Declaration – Names, Aliases, Kunyas and Variants" (Sept. 19, 2008)

Declaration of D3 ████ "Casio F-91W Watch" (Sept. 19, 2008)

ISN ██ FD-302 (June 19, 2002)
ISN ██ FD-302 (June 19, 2002)
ISN 689 FD-302 (June 20, 2002)
ISN ██ FD 302 (Aug. 6, 2002)
ISN ██ FD-302 (Sept. 9, 2002)
ISN ██ FD-302 (Sept. 11, 2002)
ISN ██ FD-302 (Sept. 14, 2002)
ISN ██ FD-302 (Sept. 16, 2002)
ISN ██ FD-302 (Oct. 25, 2002)
ISN ██ FD-302 (Feb. 26, 2003)
ISN ██ FD-302 (June 17, 2003)

SECRET//NOFORN

SECRET//NOFORN

ISN ▪ FD-302 (June 24, 2003)

ISN A2 FM40 (Jan. 13, 2003)
ISN ▪ FM40 (July 30, 2003)
ISN 689 FM40 (Sept. 22, 2003)
ISN A2 FM40 (Sept. 24, 2003)
ISN ▪ FM40 (Sep. 26, 2003)
ISN 689 FM40 (May 29, 2004)
ISN A2 FM40 (June 1, 2004)
ISN A2 FM40 (July 27, 2004)
ISN ▪ FM40 (July 28, 2004)
ISN A2 FM40 (Sept. 28, 2004)
ISN A2 FM40 (Dec. 13, 2004)
ISN ▪ FM40 (Sept. 21, 2005)







SECRET//NOFORN

b(2) ███████████████

ISN ██ CSRT Statement
ISN 689 CSRT Statement
ISN ██ CSRT Statement
b(2) ████████████████████
b(2) ████████████████████████

SAP20020404000045 (April 4, 2002)
SAP20020330000051 (March 30, 2002)
SAP20020408000048 (April 8, 2002)
TRRS-04-03-1083 (March 10, 2004)

████████████████

b(2) █████████████
b(2) ████████████
b(2) ██████████

ISN 689 Initial Screening
b(2) ████████████

████████████████

SECRET//NOFORN

SECRET█████

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED AHMED SALAM, | ) )  ) ) |
| Petitioner, | ) |
| v. | ) ) | Civil Action No. 05-CV-02386 (RBW)
| GEORGE WALKER BUSH, *et al.*, | ) ) ) |
| Respondents. | ) ) ) ) |

Declaration of ██████████████████ "Background Declaration --
Intelligence 101" (Sept. 19, 2008)

SECRET/█████





Defense Intelligence Agency

*Background Declaration — Intelligence 101*

**Joint Intelligence Task Force – Combating Terrorism**

S-633-08/JTI-3A                                                                              19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ██████████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

**(U) Intelligence**

(U) Intelligence is information essential to the security of the United States and U.S. interests, especially information that is not easily, readily, or publicly known. This information is collected in a variety of ways by different members of the U.S. Intelligence Community (IC). The type of intelligence gathered is identified by the method in which it was collected. The five main types of intelligence are:

- (U) **HUMINT**- Human Intelligence, information derived from a person(s)
- (U) **SIGINT**- Signals Intelligence, information derived from foreign electromagnetic signals transmitted for the purposes of communication
- (U) **IMINT**- Imagery Intelligence, information derived from photographs and other types of imagery.
- (U) **MASINT**- Measure and Signatures Intelligence, information derived from sensors.

Derived from: Multiple Sources
Declassify on: MR

- (U) **OSINT**- Open Source Intelligence, information that is derived from public sources such as news media.

(U) Intelligence gathered using these methods is classified to protect the sources and methods used by the IC. The level of classification depends on how sensitive the information is and the impact the release of the information would have to U.S. National Security.

- (U) **Confidential**- Release of Confidential information could reasonably be expected to cause *damage* to U.S. National Security

- (U) **Secret**- Release of Secret information could reasonably be expected to cause *serious damage* to U.S. National Security

- (U) **Top Secret**- Release of Top Secret information could reasonably be expected to cause *exceptionally grave damage* to U.S. National Security.

(U) In addition to these classifications, intelligence may be further restricted with a Sensitive Compartmented Information (SCI) caveat. In order to gain access to SCI material, a person must be "read-on" to the program that sponsors the collection of that material, reading a description of the uniquely sensitive nature of the protected information and signing a commitment to be held accountable for the program's security. SCI information is dependent on specific methods of collection; therefore, release of that information would compromise U.S. intelligence collection sources and methods.

### (U) The Intelligence Community (IC)

(U) The IC is defined as a federation of executive branch agencies and organizations that work separately and together to conduct intelligence activities necessary for advising foreign relations and protecting the national security of the United States. Such activities include:

- (U) Collection of information needed by the President, the National Security Council and the Secretaries of State and Defense, and other Executive Branch officials for the performance of their duties and responsibilities;

- (U) Production, analysis and dissemination of finished intelligence assessments;

- (U) Collection of information concerning, and the conduct of activities to protect against intelligence activities directed against the U.S. by foreign powers, organizations, and their agents, as well as by international terrorists, narcotics traffickers or other hostile foreign elements;

- (U) Administrative and other support activities within the United States and abroad for the performance of authorized activities; and



- (U) Other intelligence activities as directed by the President.

(U) The threats to the United States that the IC works to mitigate take several forms. In addition to military threats that challenged the community in the past, other transnational problems exist: terrorism, proliferation of chemical, biological, radiological, and nuclear (CBRN) materials to

potentially hostile elements, information infrastructure attacks, narcotics trafficking and foreign intelligence penetrations of sensitive programs.

## (U) IC Members

(U) The IC comprises 17 organizations, led by the Director of National Intelligence (DNI). Each member of the IC has its own expertise, mission, and area of responsibility. However, the IC collaborates in various forums, from informal communications, to joint interagency task forces. As of Executive Order 12333, July 2008, the community includes the following organizations:

- (U) The Office of the Director of National Intelligence;
- (U) The Central Intelligence Agency;
- (U) The National Security Agency;
- (U) The Defense Intelligence Agency;
- (U) The National Geospatial-Intelligence Agency;
- (U) The National Reconnaissance Office;
- (U) The other offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;
- (U) The intelligence and counterintelligence elements of the Army, the Navy, the Air Force, and the Marine Corps;
- (U) The intelligence elements of the Federal Bureau of Investigation (FBI);
- (U) The Office of National Security Intelligence of the Drug Enforcement Administration (DEA);
- (U) The Office of Intelligence and Counterintelligence of the Department of Energy;
- (U) The Bureau of Intelligence and Research of the Department of State;
- (U) The Office of Intelligence and Analysis of the Department of the Treasury;
- (U) The Office of Intelligence and Analysis of the Department of Homeland Security;
- (U) The intelligence and counterintelligence elements of the Coast Guard; and
- (U) Such other elements of any department or agency as may be designated by the President, or designated jointly by the Director and the head of the department or agency concerned, as an element of the Intelligence Community.

(U) Although several offices of federal agencies are members of the IC, the agency itself may not be a member of the IC. For example, the Department of Justice (DoJ) as an entity is not a member of the IC; however, the intelligence elements of the FBI and the DEA, which fall under the DoJ, are members of the Community.

## (U) The Intelligence Cycle

(U) The intelligence cycle drives the day-to-day activities of the IC. It is the process of developing raw information into finished products for use by the President, military, policy

makers, law enforcement or other decision makers for National Security purposes. There are five steps in the Intelligence Cycle:

- Planning
- Collection
- Processing
- Analysis and Production
- Dissemination



### (U) Planning

(U) The planning stage is the process of identifying intelligence gaps or topics of intelligence interest, prioritizing intelligence needs, and assigning the appropriate organization to obtain that intelligence. It is the beginning and the end of the cycle—the beginning because it involves drawing up specific collection requirements and the end because finished intelligence, which supports policy decisions, generates new requirements.

(U) The whole process depends on guidance from public officials. Policy makers—the President, his aides, the National Security Council, and other major departments and agencies of government—initiate requests for intelligence. At the national level, the result of the planning process is the National Intelligence Priorities Framework (NIPF).

### (U) The NIPF

(U) The NIPF is the Director of National Intelligence's guidance to the IC on the national intelligence priorities approved by the President. The NIPF consists of: (1) intelligence topics reviewed by the National Security Council Principals Committee and approved by the President, (2) a process for assigning priorities to countries and non-state actors relevant to the approved intelligence topics, and (3) a matrix showing those priorities. The NIPF matrix reflects customers' priorities for intelligence support and ensures that long-term intelligence issues are addressed.

(U) The Deputy Director of National Intelligence for Analysis (DDNI/A), on behalf of the DNI, oversees the process for developing recommendations on national intelligence priorities. DDNI/A updates the NIPF semi-annually in coordination with IC elements, the National Intelligence Council, designated Mission Managers, and the Deputy Directors of National Intelligence for Policy, Plans, and Requirements (DDNI/PPR) and Collection (DDNI/C). Ad hoc adjustments may be made to reflect changes in world events and policy priorities.



[redacted]

## (U) Collection

(U) Once intelligence requirements are assigned to the appropriate organization based on their collection assets and mission, the IC begins, or continues, to gather information to satisfy those requirements. The collection specialties of the IC members are as follows:

- (U) HUMINT- CIA, DIA, Military Services
- (U) SIGINT- NSA, Military Services
- (U) IMINT- NGA, NRO, Military Services
- (U) MASINT- DIA, Military Services
- (U) OSINT- Open Source Center (under ODNI)

## (U) Processing

(U) Once intelligence is collected, it is typically processed by analysts at the collecting agency who determine its relevance to existing validated requirements. This involves converting the vast amount of collected information to a form usable by analysts through decryption, language translations, and data reduction. This data or "raw" intelligence reporting is then reported electronically or in printed form to customers and to the all-source analytic organizations throughout the IC.

## (U) Analysis and Production

(U) The analysis and production step, which occurs at intelligence production centers throughout the IC, includes integrating, evaluating, and analyzing all available data to determine topics of interest to IC customers. Analysts consider the information's reliability, validity, and relevance to standing requirements. They integrate data from multiple sources into a coherent whole and form judgments about its collective meaning. The result is finished intelligence assessments intended to inform policy makers of the implications of the information. All-source analysis may be performed on topics of long-term interest and broad scope, or topics pertaining to ongoing events of immediate interest to policy makers.

## (U) Dissemination

(U) Dissemination is the final step in the intelligence cycle. In this step, finished intelligence is communicated to the intelligence consumer, to include those decision makers whose needs initiated the intelligence requirements. The most highly protected finished intelligence is hand-carried daily to the President and key national security advisers. However, most finished intelligence products are stored in computer data banks that allow consumers to retrieve them electronically as needed. The IC constantly strives to disseminate its products in a manner and form that best suits its consumers. Where necessary, it will tailor support to meet the needs of individual users. The recipients of finished intelligence products then make decisions based on

the information. These decisions may lead to the levying of more requirements, thus triggering the intelligence cycle.

### (U) Intelligence Reports

(U) All-source analysts utilize a variety of "raw" intelligence reports to write finished intelligence (FINNTEL) products. Many of these reports are placed into various databases that analysts regularly access. The accessibility of these reports depends on their classification; in some cases, reports may not be available to all analysts in the community. Reports disseminated into the reports databases are referred to as "message traffic." Some examples of reports by the different agencies are listed below.

### (U) DoD Human Intelligence Reports

- (U) **Intelligence Information Report (IIR).** The IIR is the main DoD reporting vehicle for the HUMINT information used by DIA and military services. It is the only report listed here that is broadly available in message traffic. DIA, as the proponent for these reports, has also issued reported numbers to a number of executive branch departments and offices. These include:

  - Department of Commerce
  - Department of Energy
  - Department of Homeland Security (DHS)
  - Department of Justice
  - Department of State, Bureau of Intelligence and Research
  - Department of State, U.S. Aid to International Development
  - Department of the Treasury
  - Drug Enforcement Administration
  - Federal Bureau of Investigation
  - Immigration & Customs Enforcement (ICE), DHS
  - National Infrastructure Protection Center
  - National Reconnaissance Office
  - U.S. Coast Guard
  - U.S. Secret Service

- **Tactical Interrogation Report (TIR).**

- **Field Intelligence Report (FIR).**





- **Draft Intelligence Information Report (DIIR).**

- **Summary Interrogation Report (SIR).**

## (U) CIA Intelligence Reports



## (U) NSA Intelligence Reports

(U) NSA intelligence reports are most commonly issued as EGRAMs, electronically transmitted reports that convey only one issue or event. They are distinguished by an alphanumeric serial number. Additional handling instructions may accompany the serial to provide additional safeguards or to protect sensitive, fragile, and/or perishable sources and methods. Access to SIGINT reporting, in addition, requires approval for access to Sensitive Compartmented Information.

## (U) Law Enforcement Forms

- (U) Field Document (FD 302)- FBI agents fill out this to summarize an interview. This form contains the notes from the interview on the information that is collected. The forms are often used in court as evidence.

- (U) Form 40 (FM40)- The Criminal Investigation Task Force (CITF) uses this form to record investigation activity, such as witness interviews, lab results fingerprint analysis, results of modeling, research results and suspect interviews. This form is used to record information relevant to how a crime was committed as well as the logical and factual basis for any deductions about guilt. CITF conducts investigations of war crimes and to determine if any persons captured in the War of Terrorism are responsible. CITF prepares cases according to the Military Commissions Act for trial by a military tribunal for war crimes and/or acts of terrorism.

## (U) Intelligence Analysis

(U) Intelligence analysis is the process of dissecting and compiling ambiguous information to determine a truth. Intelligence analysts undergo rigorous tradecraft training. Analysts use various methods and employ specific analytical tools to assist them in sorting and organizing the

various pieces of information. Analysts are trained to recognize and mitigate biases, not only in the information presented to them, but their own cognitive biases as well. The DNI issued the Directive for Analyst Standards in 2007, to ensure that all intelligence analysts in the IC use the same standards of excellence, integrity and objectivity in their assessments.

---

### (U) Analysis: Building an Analytic Argument

1. **Establish a baseline assessment:** What do we know is going on, what do we think is going on, and what do not we know that we need to figure out?

2. **Vet new information for consistency with the baseline.** Is it in the ballpark of the baseline? Does it say the same thing or does it reveal new developments? Does it add new details about something we already know? Does it say something outlandish or contradictory to reports from sources that are more reliable?

3. **Revise your baseline as necessary to accommodate new information.** If there is contradictory reporting of equally good quality, acknowledge this and explore ways it might be reconciled. If there are no good sources or reports with which to establish a reliable baseline, acknowledge the weakness of the reporting and make your best estimate.

4. **Follow-up information gaps as they become apparent.** Learn about and task collection resources as appropriate across the IC to generate new information. Work closely with collectors whenever possible.

---

### (U) Evaluating Sources

(U) Intelligence analysts must consider the source of intelligence while reading intelligence reports. Several factors help determine the credibility of a HUMINT source, most importantly placement and access to the information, and the motivation for reporting. Much like informant reports received by law enforcement official, HUMINT sources are carefully screened and subsequently rated on their reliability, both on the source themselves and the information provided. Intelligence reports include a source line that gives a description of the source and their assessed credibility by the reporting officer. Further, the analyst uses this information in their overall assessment of the intelligence provided and how it relates to other available intelligence on the same problem set.



- (U) Source's motivation (inform or influence)
- (U) (U) Wittingness of the source, and their knowledge that the U.S. government will receive the information provided

2. A context statement which provides details regarding the circumstances in which the source obtained information in the report. .

(U) Intelligence analysts take additional steps to determine source reliability, including:

- (U) Verification of intelligence by other means
    - > Other HUMINT sources
    - > Historical reporting
    - > Other intelligence disciplines (IMINT, SIGINT, MASINT, etc
    - > Review of captured documents and electronic media
- (U) Collaboration of intelligence from other members of the Community
- .(U) In some cases, a HUMINT source may be polygraphed

(U) Interrogators are trained to recognize non-verbal cues from the source that will help them determine the credibility of the information provided. Interrogators are also trained to take culturial dynamics to understand the unique psychological issues dealing with sources based on cultural norms. This provides the collectors and interrogators additional insights into deceptive behaviors.

(U) SIGINT, and more specifically communications intelligence (COMINT), is derived from the exploitation of cryptographic systems or other protected sources through the application of specific methods or techniques. In general, SIGINT reporting is deemed reliable since the information comes directly from the communicant(s). However, the information may be deliberately misleading if the communicants suspect they are being monitored and deliberately give false information, or they may be deceptive with the individuals they are communicating with, or they may have a history of providing inaccurate information.

(U) Before a finished intelligence product is disseminated, it goes through a rigorous coordination process, both in the producing organization and with peers throughout the IC. The coordination process ensures there is a consensus on the assessment, and any credibility issues are addressed.

**I have read this declaration and concur with the findings and conclusion.**



Enclosures:
1. Appendix A, (U) Special Regulations and Designations for Terrorists
2. Appendix B, IICT NIPF Counterterrorism Priorities, June 20008

███████████

3.  Appendix C, NIPF CT Priorities Terrorist Support Entities June 2008

Appendix A, (U) Special Regulations and Designations for Terrorists

## (U) Specially Designated Global Terrorist (SDGT)

(U) Executive Order 13224, empowers the Department of State and the Department of the Treasury to place both groups and individuals on the Specially Designated Global Terrorist list, which defines terrorism as: an activity that 1. involves a violent act or an act dangerous to human life, property, or infrastructure; and 2. appears to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage taking. This also includes any activity that provides financial, material, or technological support to acts of terrorism or entities designated in or under the Order.

## (U) Foreign Terrorist Organization (FTO)

(U) A Foreign Terrorist Organization (FTO) is a foreign organization designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

(U) The Office of the Coordinator for Counter Terrorism in the State Department (S/CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, S/CT looks at the actual terrorist attacks that a group has carried out and whether that group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

(U) After a target is identified, S/CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. After the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law, an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

(U) Until recently, the INA provided that FTOs must be re-designated every two years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the re-designation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its designation date (or in the case of re-designated FTOs, its most recent re-designation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a five-year period with respect to a designation, then the

Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

### (U) Legal Criteria for Designation

(U) Under Section 219 of the INA, as amended:

- (U) 1. It must be a foreign organization.

- (U) 2. The organization must engage in terrorist activity, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)),* or terrorism, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)),** or retain the capability and intent to engage in terrorist activity or terrorism.

- (U) 3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

### (U) Legal Ramifications of Designation

- (U) 1. It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge.''

- (U) 2. Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

- (U) 3. Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

### (U) Other Effects of Designation

- (U) 1. Supports our efforts to curb terrorism financing and encourages other nations to do the same.

12

- (U) 2. Stigmatizes and isolates designated terrorist organizations internationally.
- (U) 3. Deters donations or contributions to and economic transactions with named organizations.
- (U) 4. Heightens public awareness and knowledge of terrorist organizations.
- (U) 5. Signals to other governments our concern about named organizations.

## (U) Current List of Designated Foreign Terrorist Organizations

1. Abu Nidal Organization (ANO)
2. Abu Sayyaf Group
3. Al-Aqsa Martyrs Brigade
4. Al-Shabaab
5. Ansar al-Islam
6. Armed Islamic Group (GIA)
7. Asbat al-Ansar
8. Aum Shinrikyo
9. Basque Fatherland and Liberty (ETA)
10. Communist Party of the Philippines/New People's Army (CPP/NPA)
11. Continuity Irish Republican Army
12. Gama'a al-Islamiyya (Islamic Group)
13. HAMAS (Islamic Resistance Movement)
14. Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
15. Harakat ul-Mujahidin (HUM)
16. Hizballah (Party of God)
17. Islamic Jihad Group
18. Islamic Movement of Uzbekistan (IMU)
19. Jaish-e-Mohammed (JEM) (Army of Mohammed)
20. Jemaah Islamiya organization (JI)
21. al-Jihad (Egyptian Islamic Jihad)
22. Kahane Chai (Kach)
23. Kongra-Gel (KGK, formerly Kurdistan Workers' Party, PKK, KADEK)
24. Lashkar-e Tayyiba (LT) (Army of the Righteous)
25. Lashkar i Jhangvi
26. Liberation Tigers of Tamil Eelam (LTTE)
27. Libyan Islamic Fighting Group (LIFG)

28. Moroccan Islamic Combatant Group (GICM)

29. Mujahedin-e Khalq Organization (MEK)

30. National Liberation Army (ELN)

31. Palestine Liberation Front (PLF)

32. Palestinian Islamic Jihad (PIJ)

33. Popular Front for the Liberation of Palestine (PFLP)

34. PFLP-General Command (PFLP-GC)

35. al-Qaida (al-Qa'ida)

36. al-Qaida in the Islamic Maghreb (formerly GSPC)

37. Real IRA

38. Revolutionary Armed Forces of Colombia (FARC)

39. Revolutionary Nuclei (formerly ELA)

40. Revolutionary Organization 17 November

41. Revolutionary People's Liberation Party/Front (DHKP/C)

42. Shining Path (Sendero Luminoso, SL)

43. Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (QJBR) (al-Qaida in Iraq) (formerly Jama'at al-Tawhid wa'al-Jihad, JTJ, al-Zarqawi Network)

44. United Self-Defense Forces of Colombia (AUC)



Appendix B, Interagency Intelligence Committee on Terrorism NIPF Counterterrorism Priorities, June 20008



16



17















Appendix C, NIPF CT Priorities Terrorist Support Entities June 2008

(U) <u>Priority 1:</u>



(U) <u>Priority 2:</u>

<u>Definition:</u>



24



(U) <u>Priority 3:</u>

    <u>Definition:</u>







(U) <u>Priority 4:</u>

<u>Definition:</u>







(D) <u>Priority 5:</u>

<u>Definition:</u>



SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AHMED SALAM, | ) ) |
| Petitioner, | ) ) ) |
| v. | ) ) Civil Action No. 05-CV-02386 (RBW) |
| GEORGE WALKER BUSH, *et al.*, | ) ) |
| Respondents. | ) ) ) ) |

Declaration of Robert H. Holmes, "Use of Intelligence Products in the
Targeting and Operation Cycles in Operation Enduring Freedom"
(Aug. 22, 2008)

SECRET//NOFORN

SECRET//NOFORN

Use of Intelligence Products in the Targeting and Operational Cycles in Operation Enduring Freedom (OEF) (U//▮▮)

I, Robert H. Holmes, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. (U//▮▮) This is in response to the request from the Office of General Counsel for a declaration for Habeas Corpus litigation regarding the current procedures used to employ intelligence to locate and capture persons of interest on the Afghanistan battlefield. As the Deputy Director of Operations for U.S. Central Command, I am responsible for overseeing the operations of both special operations and conventional forces within the U. S. Central Command (USCENTCOM) area of operations (AOR), to include Afghanistan. From the initial stages of Operation Enduring Freedom (OEF), U.S. special operation forces (SOF) have located and disrupted terrorist networks through the use of intelligence. While the particular tactics, techniques and procedures have changed over time, the process under which OEF operators acquire and utilize battlefield intelligence remains relatively constant.

2. (U//▮▮) General. Intelligence is critical for all military forces, to include those capturing unlawful enemy combatants in Afghanistan. Ground commanders in support of Operation Enduring Freedom (OEF) in Afghanistan employ a FIND, FIX, FINISH, EXPLOIT, and ANALYZE (F3EA) process to target the leadership, supporters and key nodes of terrorist networks. The F3EA process is driven by intelligence products of all types, to include Intelligence Information Reports (IIRs), Telegraph Disseminations (TD)s, FBI 302s, FM 40s and Summary Interrogation Reports (SIRs). Commanders use multi-source and corroborated intelligence products to provide the clearest possible picture of the operational environment. This is critical in the fight against a highly compartmentalized, savvy and network-based enemy. In this fight we must be able to rapidly identify members of the network to disrupt and defeat their operations. Critically, we must then exploit the final results of that operation to lead us to the next individual inside the network before the network can react and adjust its form to become invisible again. The following explains how intelligence is used throughout this continuous cycle to drive operations and ensure we are removing the enemy from the battlefield with the highest degree of accuracy possible.

Classified By: MG Scaparotti, USCENTCOM J3
Reason: 1.4 (a)
Declassify On: 22 Aug 2018

SECRET//NOFORN

SECRET//NOFORN

3.



SECRET//NOFORN

SECRET//NOFORN



4. (U//▮▮▮) <u>**Unlawful Enemy Combatant Status Determinations.**</u>  The
intelligence products developed and validated during the F3EA
process form the foundation upon which commanders make

3

SECRET//NOFORN

SECRET//NOFORN

determinations of the actual involvement of a target individual in the enemy network and therefore ultimately lead to targeting decisions.   Intelligence products and physical evidence from the objective are useful tools with which to determine a detainee's status as an unlawful enemy combatant, and, when subjected to thorough review and analysis by the commanders making the actual determination, generally form the factual basis for that legal determination.

5.  (U//█████)   Intelligence and information produced through this F3EA process are also fed into the broader intelligence analytical cycle, which combines this data with existing information and intelligence to further task out for additional intelligence operations.   The information or intelligence derived from both the analytical cycle and the operational cycle (F3EA) are disseminated to higher, adjacent and subordinate commanders through existing intelligence systems architecture to assist in developing targets and driving operations.

6.  (U//█████)   **Conclusion.**   The process described above illustrates the ideal with no resource constraints placed upon the process.   The practical realities of the battle field often constrain the time and resources available to execute the F3EA cycle; however, the same principles can be applied even with very limited assets to develop the same effect.   Additionally, the sensitivity of the target may also drastically reduce the decision making cycle.   The F3EA process will never generate a 100% solution; however, the quality and veracity of the intelligence products remain the cornerstone of the ground commander's decision making process and the key to its success.

Signed this 22nd of August, 2008

ROBERT H. HOLMES
Brig Gen, USAF
Deputy Director of Operations

4

SECRET//NOFORN

SECRET/

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMED AHMED SALAM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-02386 (RBW) |
| | ) | |
| GEORGE WALKER BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Declaration of ███ ███ "Background Declaration -- Guest Houses" (Sept. 19, 2008)

SECRET/



Defense Intelligence Agency

*Background Declaration —Guesthouses*

**Joint Intelligence Task Force – Combating Terrorism**

S-643-08/JTI-3A                                           19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ███████████, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U)


(U) Afghanistan/Pakistan Guesthouses



(U) Al-Ansar Guesthouse

(U) Al-Ansar was a name assigned to multiple suspicious guesthouses in Kabul, Afghanistan; Kandahar, Afghanistan; and Peshawar, Pakistan. However, the majority of references to the al-Ansar guesthouses describe guesthouses in Kabul and Kandahar.

Derived from: Multiple Sources.
Declassify on: Manual Review



(U) Al-Nebras Guesthouse





(U) Afghanistan: Processing Procedures at Al-Qaida Guesthouses



(U) Conclusion



3



I have read this declaration and concur with the findings and conclusion.

4

SECRET/██████████

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMED AHMED SALAM, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) | Civil Action No. 05-CV-02386 (RBW) |
| GEORGE WALKER BUSH, *et al.*, | ) ) ) | |
| Respondents. | ) ) ) | |

Declaration of ██████████ "Background Declaration -- Terrorist Training Camps" (Sept. 19, 2008)

SECRET/██████████



Defense Intelligence Agency

*Background Declaration – Terrorist Training Camps*

**Joint Intelligence Task Force – Combating Terrorism**

19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ▉▉▉▉▉▉ pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U)

**(U) Afghan Training Camps: 1989 - 2001**

**(U) Overview:**

**(U) Camp Breakdowns**

Derived from: Multiple Sources
Declassify on: Subject to treaty or international agreement



**(U) Al-Qaida Camps**

**(U) Al-Faruq Training Camps**

- (S//NF)



(U) According to The 9/11 Commission Report at least seven of the 9/11 hijackers who provided "muscle" for the attacks went through a basic training regime at the al-Faruq camp, and one of the pilots, Hani Hanjour, was identified for inclusion in the plot while training at al-Faruq. The Commission concluded this particular camp appears to have been the preferred location for vetting and training the potential muscle hijackers because of its proximity to Usama Bin Ladin and other al-Qaida senior leaders.



**(U) Mes Aynak**



**(U) Tarnak Farms aka Abu Obeida Training Camp**



SECRET//ORCON//NOFORN



(U) Camps Utilized by al-Qaida and Others



(U) Derunta Training Camp Complexes

(U) The Derunta training complex, located 15 miles from Jalalabad, Afghanistan, was a set of advanced terrorist training camps offering training in various explosives, poisons, and chemical warfare agents. Coalition forces destroyed the camp in October 2001.



(U) Derunta: Curriculum



4



**(U) Derunta: Students of Abu Khabab al-Masri**



(U) Sada Training Camp



(U)  **Khaldan Camp**

(U)  While the Khaldan camp was not an al-Qaida facility, Abu Zubaydah had an agreement with bin Ladin to conduct reciprocal recruiting efforts whereby promising trainees at the Khaldan camp that they could join al-Qaida if desired.

- ~~(S//NF)~~



(U)  Abu Yahya Camp for the Libyan Islamic Fighting Group



I have read this declaration and concur with the findings and conclusion.



8

~~SECRET~~/█████

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AHMED SALAM,    ) | |
|        ) | |
| Petitioner,    ) | |
|        ) | |
| v.    ) | Civil Action No. 05-CV-02386 (RBW) |
|        ) | |
| GEORGE WALKER BUSH, *et al.*,    ) | |
|        ) | |
| Respondents.    ) | |
|        ) | |

Declaration of ████████ "Tora Bora" (Sept. 19, 2008)

SECRET█████



Defense Intelligence Agency

*Tora Bora*

**Joint Intelligence Task Force – Combating Terrorism**

S-601-08/JTI-3A                                                    19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ████████, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U)



**(U) Afghanistan:  Tora Bora**

**(U) Background**

(U) Tora Bora is the name of a cave complex situated in the White Mountains of Eastern Afghanistan, which lie at the border of Nangarhar, Afghanistan, and Parachinar, Pakistan. The cave complex was built in the early 1980s to support mujahideen forces battling against the Soviets.  Although the caves were formed naturally, they were enhanced with hydroelectric power, and were capable of housing more than one thousand fighters.  The corridors, many interconnected and some miles long, were fully stocked with food, water, and ammunition.  There are multiple entrances at various levels along the mountainside with some of the corridors exiting into Pakistan.  In the 1990s, Usama bin Ladin used the cave complex as his headquarters.

Derived from:  Multiple Sources
Declassify on:  MR



**(U) Caves Details**

**(U) Escaping Tora Bora**



**(U) Detainees from Tora Bora**



I have read this declaration and concur with the findings and conclusion.



3

SECRET/███████

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED AHMED SALAM, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) ) |
| GEORGE WALKER BUSH, *et al.*, | ) ) ) |
| Respondents. | ) ) ) ) |

Civil Action No. 05-CV-02386 (RBW)

Declaration of ████████ Background Declaration – The Libyan
Islamic Fighting Group (LIFG)" (Sept. 19, 2008)

SECRET/███████



Defense Intelligence Agency

*Background Declaration – The Libyan Islamic Fighting Group (LIFG)*

**Joint Intelligence Task Force – Combating Terrorism**

19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ███████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U) ███████████████████████████████████

**(U) The Libyan Islamic Fighting Group (LIFG)**

Derived from: Multiple Sources
Declassify on: MR

**(U) LIFG in Afghanistan and Pakistan**



- (U) In his November 2007 statement announcing the LIFG-al-Qaida merger, al-Qaida deputy Ayman al-Zawahiri highlighted the mission to fight America, France, Spain, Libya, Tunisia, Algeria, and Morocco.

- (U) In the statement, Abu Layth al-Libi also described Libyan leader Qadhafi as a "slave" to the United States who provides oil to crusaders instead of his own people, indicating LIFG would operate "side by side" with AQIM in its pursuits. Abu Layth further directed listeners to launch jihad against the Qadhafi regime and the Americans, claiming they attempt to use Libyan territory to launch war against Islam.

**(U) Conclusion**



2

███████████████

I have read this declaration and concur with the findings and conclusion.

███████████████████

████████

███████████████████

3

SECRET█

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AHMED SALAM, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-02386 (RBW) |
| ) | |
| GEORGE WALKER BUSH, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| ) | |

Declaration of █████ "Background Declaration – Terrorist
Organization,"
(Sept. 29, 2008)

SECRET█





Defense Intelligence Agency

*Background Declaration – Terrorist Organization*

**Joint Intelligence Task Force – Combating Terrorism**

S-667-08/JTA-1B                                        29 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U) ████████████████████

**(U) The Islamic Movement of Uzbekistan**



Classified by: Multiple Sources
Declassify: Manual Review



**(U) History of the IMU**

**(U) Conclusion**

I have read this declaration and concur with the findings and conclusion.

