UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDUL RAZAK ALI, | ) |
| Petitioner, | ) ) ) ) |
| v. | ) Civil Case No. 10-1020 (RJL) |
| BARACK H. OBAMA,[1] *et al.*, | ) ) ) |
| Respondents. | ) |

MEMORANDUM ORDER
(January 11, 2011)

Petitioner Abdul Razak Ali, who now claims his name to be Saeed Bakhouche (hereafter "petitioner," "Bakhouche," or "Razak"), is an Algerian detainee being held at the U.S. Naval Base at Guantanamo Bay, Cuba. He alleges that he is being unlawfully detained by President Barack H. Obama, Secretary of Defense Robert M. Gates, and various others in the relevant chain of command (collectively, "Respondents" or the "Government"). On December 14, 2010, this Court commenced a habeas corpus hearing for Bakhouche. That morning, counsel for both parties made unclassified opening statements in a public hearing. Petitioner listened to a live translation of the opening statements via a telephone transmission to Guantanamo Bay, Cuba.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

1

Thereafter, the Court went into a closed-door session to hear each side present an opening statement that included relevant classified information. Upon completion of their statements, each side presented its evidence, most of which included classified material, and arguments regarding various material issues of fact in dispute between the parties. Because these presentations were not completed by the end of the day on December 14, 2010, the Court reconvened the following day. Once again, presentations and arguments relating to various classified materials consumed most of this day and the Court, as a result, scheduled closing arguments two days later, on December 17, 2010. After hearing each side's closing arguments, the Court informed the parties that it would hold a public hearing in the near future to announce its decision. A classified version of this opinion setting forth in greater particularity the factual basis of the Court's ruling will be distributed in the upcoming weeks and issued through the Court Security Office, together with the final judgment.

Before stating the Court's ruling, a brief statement of the relevant factual and procedural background of the case is appropriate.

## BACKGROUND

Petitioner is a forty-year old Algerian citizen who was captured on March 28, 2002, by Pakistani forces in a raid at a guesthouse in Faisalabad, Pakistan. He was caught together with a well known Al Qaeda facilitator: Abu Zubaydah. Indeed, Abu Zubaydah was at that very time assembling a force to attack U.S. and Allied forces. Captured along with the petitioner and Abu Zubaydah were a bevy of Abu Zubaydah's senior leadership, including instructors in engineering, small arms, English language

2

(with an American accent), and various electrical circuitry specialists. Also found at the guesthouse were pro-al Qaeda literature, electrical components, and at least one device typically used to assemble remote bombing devices (*i.e.*, improvised explosive devices or "IED"s). Petitioner was transported to Bagram Air Force Base for questioning, where he was held before being transferred to the U.S. Naval Base in Guantanamo Bay, Cuba, in June 2002.

In the aftermath of the Supreme Court's decision in *Rasul v. Bush*, 124 S. Ct. 2686, 2691-92 (2004) (holding that 28 U.S.C § 2241 extended statutory habeas corpus jurisdiction to Guantanamo), petitioner filed this habeas corpus petition in this Court on December 21, 2005. (Pet. For Writ of Habeas Corpus [Dkt. #1].) The case was originally assigned to my colleague, Judge Reggie B. Walton. As with hundreds of other petitions filed around that time, no action was taken until the Supreme Court ruled on June 12, 2008, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), that Guantanamo detainees are "entitled to the privilege of habeas corpus to challenge the legality of their detention." (*Id.* at 2262.)

Pursuant to an agreement between most of the judges of this Court, Judge Walton agreed to have Judge Thomas F. Hogan formulate the initial Case Management Order ("CMO") which would define the procedural process (*i.e.*, including the burden of proof, standard of proof, and definition of enemy combatant) that would guide the litigation of these detainee cases.[2] On November 6, 2008, Judge Hogan issued a consolidated Case

---

[2] I chose not to reassign the habeas cases originally on my docket to Judge Hogan for this purpose. Instead, I issued my own CMO on August 27, 2008, that I used in the various

3

Management Order for all of the judges who had transferred their cases to him for this procedural purpose. (Case Mgm't Order, Nov. 6, 2008 [Dkt. #689].) That CMO was amended several times thereafter by both Judge Walton (*i.e.*, on November 12, 2008 (Order, Nov. 12, 2008 [Dkt. #695]) and December 19, 2008 (Order, Dec. 19, 2008 [Dkt. #797])) and by Judge Hogan on December 16, 2008 (Order, Dec. 16, 2008 [Dkt. #784]). Ultimately, petitioner filed a Motion for an Expedited Judgment in his case on January 16, 2009. (Notice of Filing Mot. for Expedited J., Jan. 16, 2009 [Dkt. #902].) Judge Walton issued a further supplemental Case Management Order thereafter on February 19, 2009 (Supp. Case Mgm't Order, Feb. 19, 2009 [Dkt. #1011]), which he amended on March 27, 2009 (Order, Mar. 27, 2009 [Dkt. #1101]).

On April 21, 2009, Judge Walton transferred this case to Chief Judge Lamberth for reasons of judicial economy. (Order, Apr. 21, 2009 [Dkt. #1153].) On May 28, 2009, petitioner filed a Renewed Motion for Expedited Judgment. (Order Memorializing Oral Rulings, May 28, 2009 [Dkt. #1190].) The Government filed its Factual Return on July 29, 2009. (Notice of Pub. Filing of Factual Return, July 29, 2009 [Dkt. #1282].) Again on August 28, 2009, petitioner filed a Renewed Motion for Expedited Judgment. (*See* Memo. and Op., Nov. 19, 2009, at n.1 [Dkt. #1337].) On September 24, 2009, Chief Judge Lamberth denied petitioner's motion. (*Id.*)

---

habeas proceedings assigned to me. That CMO, among other things, placed the burden of proof on the Government, set the standard of proof as a preponderance of the evidence, provided discovery rights for detainees (including a right to "exculpatory" materials), and formulated the procedural processes that would guide the hearings in my Court. In addition, it set forth the definition of "enemy combatant" that the Government's evidence would have to satisfy. (*See Boumediene v. Bush*, No. 04-1166, Case Mgm't Order, Aug. 27, 2008 [Dkt. #142].) This procedural framework was ultimately blessed by our Circuit Court this past June in *Al-Bihani v. Obama*, 590 F.3d 866, 869-70 (D.C. Cir. 2010).

4

On October 5, 2009, petitioner filed his Traverse in this case and filed motions seeking certain discovery. (Notice of Filing Traverse, Oct. 5, 2009 [Dkt. #1317].) While this discovery process was still pending, however, petitioner moved to recuse Chief Judge Lamberth on January 29, 2010, based on public comments he had made regarding the role of the legislature in deciding issues related to detention cases. (Mot. for Recusal, Jan. 29, 2010 [Dkt. #1361].) On June 6, 2010, Judge Lamberth issued an order recusing himself from the case. (Order, June 6, 2010 [Dkt. #1418].) On June 16, 2010, the case was randomly reassigned to this Court. (Reassgm't of Civil Case, June 16, 2010 [Dkt. #1419].) On August 4, 2010, I scheduled an initial status conference in this case for August 19, 2010. (Minute Entry, Aug. 4, 2010.)

On August 19, this Court met with the parties and inquired into the state of the record and remaining discovery issues, and to set a date for the merits hearing. (Minute Entry, Aug. 19, 2010.) Six days later, on August 25, 2010, I issued a CMO in this case. (Case Mgm't Order, Aug. 25, 2010 [Dkt. #1423].) That order was virtually identical to the CMO I had issued on August 27, 2008, in *Boumediene v. Bush*, No. 04-cv-1166, and that I had used in the six other habeas merits hearings I held in the eight months that followed the *Boumediene* hearing. (No. 04-cv-1166, Case Mgm't Order, Aug. 27, 2008 [Dkt. #142].) It was also virtually identical to the CMO I had issued just a few weeks earlier, on August 4, 2010, in *Obaydullah v. Obama*. (No. 08-cv-1173, Case Mgm't Order, Aug. 4, 2010 [Dkt. #77].)

On August 26, 2010, I held a discovery hearing to address certain pending discovery requests by the petitioner. (Minute Entry, Aug. 26, 2010.) On September 10,

2010, I held a follow-up status conference to address those discovery issues further and to schedule the merits hearing in this case for October 4 and 5, 2010. (Minute Entry, Sept. 10, 2010.) On September 15, 2010, however, petitioner's counsel requested a continuance of the merits hearing to enable her to meet once again with her client in Cuba. (Mot. to Reschedule Habeas Hr'g, Sept. 15, 2010 [Dkt. #1428].) On September 21, 2010, I granted her request and converted the October 4, 2010 hearing into a status hearing. (Minute Entry, Sept. 21, 2010.) On October 4, 2010, I rescheduled the merits hearing for December 14 and 15, 2010, and gave petitioner until November 5, 2010, to amend his Traverse. (Minute Entry, Oct. 4, 2010.) On November 18, 2010, the Government filed its response to the Amended Traverse. (Notice of Filing Resp. to Pet.'s Amended Traverse, Nov. 18, 2010 [Dkt. #1443].)

On December 7, 2010, I held a pre-hearing conference with counsel in an effort to narrow the factual issues to be covered at the merits hearing. (*See* Minute Entry, Oct. 4, 2010.) At that hearing I informed detainee's counsel that I had received a notice of an *ex parte* filing from the Government the previous day that was classified at the top secret level. (*See* Notice of Classified *Ex Parte* Filing, Dec. 6, 2010 [Dkt. #1444].) In addition, I informed the parties that it had been my practice in all of my previous habeas cases to refrain from reviewing such filings until such time as I had a need to do so. Indeed, I informed counsel for both parties that because detainee counsel, in my judgment, has a "need to know" any evidence being relied upon by the Government to sustain petitioner's ongoing detention, the Government would only be permitted to keep this evidence from detainee counsel if doing otherwise would endanger our national

security. Accordingly, unless and until the Government needed to rely on the information contained in the *ex parte* filing in either its case-in-chief or rebuttal case, the Court would *not* review it or conduct the type of hearing that using it would necessitate. Neither side noted any concern regarding this approach. Moreover, at no time during the merits hearing held on December 14, 15, and 17, did the Government either inform the Court that its *ex parte* filing related to its pretrial discovery obligations or express any need or intent to rely upon the evidence contained in the *ex parte* filing.

On December 22, 2010, the Court informed the parties that it would announce its unclassified opinion in open court on December 30, 2010. On December 23, 2010, however, counsel for the Department of Justice informed the Court's staff *for the first time* that it had just received permission from its client to inform the Court via telephone that the *ex parte* pleading it had previously filed concerned potentially exculpatory information that the Government had not turned over to detainee counsel because it was classified at a higher classification level than detainee counsel was authorized to view. As a result, I immediately held an *ex parte* hearing that afternoon with Government counsel to inquire into the circumstances surrounding the Government's failure to previously inform me of this fact and to obtain some sense as to the nature of this "exculpatory" material. I specifically cautioned counsel, however, not to reveal at this point the substance of the material contained in its *ex parte* filing. At that hearing, Department of Justice counsel apologized for failing to inform the Court directly of the exculpatory nature of its *ex parte* filing. In addition, he informed the Court that the nature of the exculpatory evidence was such that it related *only* to the credibility and

reliability of one particular identification witness that the Government was relying upon in its case-in-chief. In response, the Court informed the Government counsel that in its judgment, detainee counsel has a need to know and a right to review exculpatory material that relates to the credibility and reliability of any witness whose statements are being relied upon by the Government. Accordingly, in order to legally justify *not* providing such information to detainee counsel, the Government would have to satisfy the Court that providing such information to detainee counsel for use in a closed proceeding would somehow endanger the national security of the United States. As such, the Government, in essence, had to decide whether it wished to continue relying on the statements of this witness. If so, the Court would hold an *ex parte* hearing on December 28, 2010, to address the national security implications of revealing this exculpatory information to detainee counsel. If not, the Court would hold a conference call that same day to inform detainee counsel of these developments, and of the Government's withdrawal of reliance on this particular witness.

On December 24, 2010, Government counsel notified the Court via facsimile that it had decided to withdraw all reliance on the witness in question, thereby obviating the necessity of an *ex parte* hearing on December 28, 2010. As a consequence, the Court had no need to open and review the materials in the *ex parte* application. Three days later, the Government filed a public pleading in advance of the scheduled telephone call in which it notified detainee counsel of its intention to withdraw its reliance on the statements of this particular witness. (*See* Resp.'s Notice of Withdrawal of Reliance on Statements by Third-Party Detainee, Dec. 27, 2010 [Dkt. #1445].) Unfortunately, the

Government's filing did *not* give a complete and accurate description of the events preceding that decision. Nevertheless, the Court held the conference call with counsel for both sides on December 28, 2010, to correct the record for the benefit of detainee's counsel and to address those events. On that occasion, detainee counsel requested an opportunity to reformulate and re-present her closing argument in light of the removal of the evidence from the Government's case. (*See also* Pet.'s Mot. to Withhold Ruling, Dec. 28, 2010 [Dkt. #1446].) The Court granted her request and set a hearing for January 4, 2011. (Minute Entry, Jan. 4, 2011.) On that day, counsel for both sides presented hour-long supplemental closing arguments to the Court based on the amended record.

After a careful review of the Factual Return and Traverse, in all of their amended forms, and after three days of hearings on the factual issues in dispute and the arguments of counsel, the following is the Court's ruling on Bakhouche's petition.

## LEGAL STANDARD

Under this Court's CMO, the Government bears the burden of proving the lawfulness of the petitioner's detention by a preponderance of the evidence. In the *Boumediene* cases, and in six subsequent habeas merits hearings, the Court adopted the following definition of "enemy combatant" to delineate those who could be detained lawfully:

> An "enemy combatant" is an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

9

*Boumediene v. Bush*, 583 F. Supp. 2d 133, 135 (D.D.C. 2008). In the aftermath of the change in administrations in January 2009, however, the Government for reasons unknown to this Court, now eschews the use of the phrase "enemy combatant" and simply argues instead that petitioner Bakhouche is the type of individual that is detainable under the AUMF because he was "part of" an "associated force" (*i.e.*, Abu Zubaydah's force) engaged in hostilities against the United States or its Allied forces. Either way, the petitioner's status ultimately depends on his relationship, if any, with Abu Zubaydah's force. Fortunately, there is no real discrepancy between these two standards in that regard, and therefore choosing between them is *not* necessary to a ruling on the petition in this case.

## ANALYSIS

The Government contends that the petitioner was a member of Abu Zubaydah's force that was reorganizing at a guesthouse in Faisalabad, Pakistan, and preparing for future operations against U.S. and Allied forces. In particular, the Government contends that the petitioner: (1) lived with Abu Zubaydah and a cadre of his lieutenants during a two week period; (2) previously traveled with Abu Zubaydah's force through Afghanistan and ultimately fled with them through Afghanistan to Pakistan; and (3) took an English course (with an American accent) when he was staying at Abu Zubaydah's guesthouse.

Petitioner, not surprisingly, disagrees. Although he acknowledges being captured in the same guesthouse as Abu Zubaydah, he denies: (1) ever being in Afghanistan, let alone being with Abu Zubaydah's force there; (2) ever taking an English course from

Abu Zubaydah's trainers at the guesthouse; and (3) ever being a member, permanent or otherwise, of Abu Zubaydah's force. In essence, he claims that the Government has mistakenly identified him as a member of Abu Zubaydah's force, who traveled with Abu Zubaydah in Afghanistan and fled with him to Pakistan before gathering at this particular guesthouse to start preparing for their next offensive against U.S. and Allied forces. Upon reviewing the Return, the Traverse, and the oral argument during the merits hearing, I disagree with the petitioner's contention and conclude for the following reasons that the Government has more than adequately established that it is more likely than not that petitioner Bakhouche was, in fact, a member of Abu Zubaydah's force and is therefore detainable under the AUMF.

At the outset it is worth noting that our Circuit Court has *unequivocally* recognized that Abu Zubaydah and his band of followers have well established ties to al Qaeda and the Taliban and thus constitute an "associated force" under the AUMF. *See Barhoumi v. Obama*, 609 F.3d 416, 420 (D.C. Cir. 2010) (affirming the district court's conclusion that Barhoumi was part of "Abu Zubaydah's militia – an 'associated force that was engaged in hostilities against the United States or its coalition partners'" and affirming denial of petitioner Barhoumi's writ); *Al Harbi v. Obama*, No. 05-02479, 2010 WL 2398883, at *14 (D.D.C. May 13, 2010) ("There appears to be no dispute that Abu Zubaydah was an al Qaeda operative and that Al Qaeda-related activities took place in his [Faisalabad] house."). Thus, a member of Abu Zubaydah's force is, by definition, detainable under the AUMF. Indeed, petitioner does not dispute this, focusing instead on whether he was actually a member of Abu Zubaydah's force.

The Government, of course, does not rely exclusively on petitioner's capture in the same guesthouse as Abu Zubaydah – although the Government contends, and the Court acknowledges, that that *alone* is enough to warrant petitioner's detention under the AUMF. *See Khalifh v. Obama*, No. 05-1189, at 12 (D.D.C. May 29, 2010) ("Whatever interaction [petitioner] might have had with the top terrorists he met, whether it was limited or extended, his presence with them at [a] guesthouse is quite powerful support to the inference that he was considered a member of al Qaeda (and/or associated forces) at the time. Without such an understanding, he would not have been permitted to be around so many terrorists for any amount of time."). Instead, the Government directs this Court to what petitioner was doing *while* he was at the guesthouse with Abu Zubaydah and his senior leadership, and what he was doing *before* he arrived at that guesthouse.

As to the former, the Government sets forth credible accounts by fellow guesthouse dwellers who not only positively identified the petitioner by one of the various names he was using at that time – *i.e.*, Abdul Razak – but who also credibly account for petitioner participating in one of Abu Zubaydah's various training programs while he was staying in the guesthouse (*i.e.*, taking a class in English). Combining this evidence with the obvious and common-sense inference that a terrorist leader like Abu Zubaydah would not tolerate an unknown and untrusted stranger to dwell in a modest, two-story guesthouse for two weeks with himself and ten or so of his senior leadership, while they are preparing for their next operation against U.S. and Allied forces, the Court cannot help but conclude that petitioner's presence at this guesthouse is enough, *alone*, to

find that he was more likely than not a member of Abu Zubaydah's force. But, there is more!

The Government also introduced credible evidence placing petitioner with Abu Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad guesthouse. For example, one of his fellow detainees – who was also captured in the guesthouse – positively identified petitioner's photo by both of the names he was using at that time (*i.e.*, Abdul Razak and Usama al Jaza'iri) and recalled petitioner being in a particular location in Afghanistan prior to their arrival in Pakistan. His statements were corroborated by a contemporaneous diary propounded by one of Abu Zubaydah's close friends (the "al Suri diary") which not only listed petitioner – under the same name Usama al Jaza'iri – as a *permanent* member of Abu Zubaydah's group, but also placed him in at least one of the same locations in which this eyewitness identified him. Indeed, our Court of Appeals, in a recent case involving another detainee who was captured the same day in the same guesthouse as petitioner, found this very diary to be a credible source as to that other detainee's membership in Abu Zubaydah's force. *Barhoumi*, 609 F.3d at 432. In addition, petitioner was cited by that same name in a separate report listing the survivors of a fire in a different location in Afghanistan. In sum, the Government proffered more than enough credible evidence for this Court to conclude that it is more likely than not that petitioner was, indeed, a member of Abu Zubaydah's force. That conclusion, I might add, is corroborated further by petitioner's own admission – when he was first interrogated – that he had gone to Afghanistan to fight in the jihad against the U.S. and its Allied forces.

Bakhouche, of course, vigorously denies the accuracy of the numerous photo identifications of him as Abdul Razak, and especially the one photo identification of him as Usama al Jaza'iri. In particular, he denies being the "Usama al Jaza'iri" referred to in the al Suri diary and the fire incident report and denies being a member, much less a permanent member, of Abu Zubaydah's force who traveled with them for a protracted period in Afghanistan. To the extent I can be specific in discussing the shortcomings of his position in this unclassified opinion, suffice it to say that while his challenge to the reliability of certain photo identifications might be more compelling if these witnesses had only seen him on one particular occasion in either Pakistan or Afghanistan, it is particularly undercut by petitioner's own admission that he had stayed at the Abu Zubaydah guesthouse with not only the witness who identified him as Usama al Jaza'iri, but also with a number of the other witnesses who identified him as Abdul Razak. Simply put, Bakhouche's effort to undermine the reliability of the Government's evidence linking him to the Abu Zubaydah group *prior* to his capture at the guesthouse is inherently flawed and undermined by his own lack of credibility on certain critical points. In particular, Bakhouche's stubborn insistence that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse, was wholly incredible.

As such, the Court has no difficultly concluding that the Government more than adequately established that it is more probable than not that the petitioner was in fact a member of Abu Zubaydah's force that had gathered in that Faisalabad guesthouse to prepare for future attacks against U.S. and Allied forces. Accordingly, petitioner

Bakhouche is being lawfully detained under the AUMF and this Court must, and will therefore, DENY his petition for a writ of habeas corpus.

## CONCLUSION

For all of the foregoing reasons, and for the reasons that will be set forth in greater particularity in the forthcoming classified version of this opinion, it is hereby

**ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**

*[signature]*
RICHARD J. LEON
United States District Judge